**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT COURT OF COLORADO**

Civil Action No. _____

JACQUELINE ARMENDARIZ and CHINOOK CENTER,

Plaintiffs,

v.

CITY OF COLORADO SPRINGS;

DANIEL SUMMEY, a detective with the Colorado Springs Police Department, in his individual capacity;

B.K. STECKLER, a detective with the Colorado Springs Police Department, in his individual capacity;

JASON S. OTERO, a sergeant with the Colorado Springs Police Department, in his individual capacity;

ROY A. DITZLER, a police officer with the Colorado Springs Police Department, in his individual capacity; and

FEDERAL BUREAU OF INVESTIGATION;

Defendants.

## COMPLAINT

## INTRODUCTION

1.      This action addresses the Colorado Springs Police Department's ("CSPD")

unconstitutional and invasive search and seizure of the phones, computers, devices, and private

chats of people and groups whose message CSPD dislikes.

2.      Over the last several years, CSPD has engaged in a concerted campaign against

activists in the region, abusing its powers to target them through infiltration, surveillance, and

dragnet warrants to search and seize their personal devices and digital data without justification.

CSPD's actions expose a pervasive disregard for longstanding constitutional rules meant to constrain law enforcement and protect personal privacy, with far-reaching implications for everyone in our community.

3.     The case arises out of CSPD officers' actions following a housing rights march in Colorado Springs on July 31, 2021. Plaintiff Chinook Center and several other groups helped organize the constitutionally protected housing march.  Plaintiff Jacqueline Armendariz marched at the event, along with prominent Chinook Center members and other activists concerned about the local housing crisis.

4.     CSPD targeted Chinook Center leaders for arrest at the march, sharing pictures of the activists in advance and stating that they would get a "boot to the head." Ultimately, a CSPD commander ordered arrests of prominent Chinook Center members for marching in the street, even after the protestors complied with police requests to move onto the sidewalk.

5.     Colorado Springs police then obtained a search warrant—one of several that are the subject of this lawsuit—to search the Chinook Center's private chats on Facebook Messenger.  The warrant did not even purport to be supported by probable cause. It was not limited to a search for any particular evidence, let alone evidence of a particular crime, and it was unlimited as to topics.  The warrant was an unjustified effort to intrude on the private messages of a group whose political expression the CSPD dislikes.

6.     CSPD also arrested and charged Armendariz for dropping her bicycle in the path of an officer during the march, even though the officer easily avoided the bicycle and was not injured in any way.  CSPD seized Armendariz's cell phones, her laptops, and an external hard drive without any justification or probable cause that they contained specific, particularized

evidence of the alleged bike-dropping crime.  Then CSPD sought and executed a warrant to copy her phones and devices in their entirety and search them for evidence of her political views, her political associations, and her relationship with the Chinook Center. There was no probable cause for this search and it was not limited to a search for any particular evidence.

7.      The warrants targeting Chinook and Armendariz were part of a pattern and practice of unconstitutional actions intended to teach activists a lesson:  Colorado Springs police would retaliate against political expression with dragnet warrants to chill free speech.

8.      CSPD's repeated justification to copy, search, and retain the contents of activists' phones and computers was that people use their phones to take pictures and send messages.  Tolerating or accepting this justification would eviscerate the Fourth Amendment and justify unbounded intrusions into the privacy of anyone even associated with someone accused of a crime. Unless called to account in this lawsuit, the police could seize and search the phones and devices of anyone in our community.

9.      Fortunately, the state and federal constitutions were intended to prohibit precisely the types of general warrants at issue here, where police search private homes and private data roaming for evidence of some unspecified bad acts.  Our constitution recognized the profound danger that these types of warrants would have on freedom and liberty and precluded them.  Indeed, these types of general warrants were common in the time of King George and helped lead to the American Revolution.

10.     Plaintiffs Jacqueline Armendariz and the Chinook Center bring this action to hold the City of Colorado Springs and its officers accountable for their unconstitutional practices and stop this Orwellian surveillance.

## PARTIES

### A.      Plaintiffs

11.      The Chinook Center (sometimes, "Chinook") is a 501(c)(3) non-profit and volunteer membership organization that serves as a clearinghouse for progressive activism in Colorado Springs. Opened by Jon Christiansen, Shaun Walls, Samantha Christiansen, and others in the summer of 2019, the Chinook Center was founded against the backdrop of racial justice protests sparked by the police killing of George Floyd in the summer of 2020 and, closer to home, the 2019 CSPD killing of De'Von Bailey.

12.      Since its inception, the Chinook Center has provided a community space for existing and emerging organizations and activists to build connections and facilitate projects for a diverse array of grassroots work, including a "Housing for All" campaign that serves to address the housing crisis in Colorado.

13.      Ms. Armendariz is a resident of Colorado. She has been a volunteer and participant in activities sponsored or promoted by the Chinook Center.

### B.      Defendants

14.      Defendant City of Colorado Springs is a municipal corporation incorporated in the State of Colorado. It carries out law enforcement activity through CSPD. All officers and employees of CSPD are agents of the City of Colorado Springs. The City of Colorado Springs is responsible for ensuring that its officers carry out their duties without violating the constitutional and statutory rights of the individuals with whom they come in contact.

4

15.     At all times relevant to this Complaint, defendant Daniel Summey ("Summey") was a detective with CSPD and a peace officer under C.R.S. § 24-31-901(3) acting under color of state law and within the scope of his employment. He is sued in his individual capacity.

16.     At all times relevant to this Complaint, defendant B.K. Steckler ("Steckler") was employed as a detective by CSPD and a peace officer under C.R.S. § 24-31-901(3) acting under color of state law and within the scope of his employment. He is sued in his individual capacity.

17.     At all times relevant to this Complaint, defendant Jason S. Otero ("Otero") was employed as a sergeant by CSPD and a peace officer under C.R.S. § 24-31-901(3) acting under color of state law and within the scope of his employment. He is sued in his individual capacity.

18.     At all times relevant to this Complaint, defendant Roy A. Ditzler ("Ditzler") was employed as a detective by CSPD and a peace officer under C.R.S. § 24-31-901(3) acting under color of state law and within the scope of his employment. He is sued in his individual capacity.

19.     Defendant Federal Bureau of Investigation (FBI) is a federal law enforcement agency and acted through the Rocky Mountain Regional Computer Forensics Laboratory (RMRCFL), an FBI-run forensic computer laboratory in Centennial, Colorado.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343. Plaintiffs' federal claims arise under the laws of the United States, including the Constitution of the United States, 42 U.S.C. § 1983, and 18 U.S.C. § 2707.

21.     This court has supplemental jurisdiction over Plaintiffs' closely related state law claims pursuant to 28 U.S.C. § 1367.

22.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All plaintiffs and defendants reside within the District of Colorado, and the actions and threatened actions occurred within the District of Colorado.

## FACTUAL ALLEGATIONS

### CSPD Prepares to Arrest Targeted Activists at Housing March on July 31, 2021

23.     The Chinook Center and other local activists wanted to bring attention to the lack of affordable housing and the associated housing crisis in Colorado Springs, as well as the end of the federal eviction moratorium which was set to occur on July 31, 2021.  To highlight the deficiencies in the City's housing policies and the end of the federal eviction moratorium, they called for a housing rally and march on July 31, 2021, proclaiming that "housing is a human right." July 31 was also the day that the City of Colorado Springs planned a parade and a celebration of its sesquicentennial.

24.     The actions by CSPD at and following the housing march in 2021 were precipitated by relevant history between CSPD and Colorado Springs activists.

25.     Among other things, CSPD and the FBI had been spying on the Chinook Center and other activist groups since the summer of 2020, with CSPD Detective April Rogers masquerading undercover as an activist, participant, and volunteer with Chinook and allied organizations. Detective Rogers provided a fake name (Chelsie Kurti) to the organizations and posed as an activist interested in supporting their work. On information and belief, knowing that the activists were politically active, Detective Rogers registered to vote under the fake name that

she provided to activists, which itself is a crime. The initiation of surveillance of the activist

community in Colorado Springs coincided with the racial justice protests in the summer of 2020,

in response to the May 2020 police killing of George Floyd and the August 2019 killing by

CSPD of a 19-year-old black man in Colorado Springs named De'Von Bailey.

26.     In particular, on August 3, 2020, the one-year anniversary of De'Von's killing

(August 3, 2019), racial justice activists took part in a protest in the Pulpit Rock neighborhood at

the home of the CSPD police officer who shot De'Von Bailey. As described below, that protest

so outraged CSPD officers that they began an extraordinary campaign against activists to

retaliate and surveil the social justice organizations in Colorado Springs. In fact, the day after the

protest at Pulpit Rock, Detective Rogers reached out to Chinook leaders and even offered to

donate a filing cabinet to their office space.

27.     Detective Rogers began regularly communicating with leaders at the Chinook

Center and volunteering with other non-profit organizations that used Chinook's space. She

gained access to Chinook-affiliated organizations' membership records, cell phones, and email

accounts.

28.     On information and belief, CSPD and the FBI were using Detective Rogers to

spy on Chinook and other activists and gather information about the social justice activist

community in Colorado Springs.  CSPD had prepared reports about many of the activists

associated with the Chinook Center and other organizations that they later used to target Chinook

leaders at the housing march.  The reports contained photographs of Chinook leaders and others

likely taken from social media like Facebook, Instagram, and LinkedIn.  On information and

belief, these dossiers were compiled as part of a warrantless program known as Social Media

Exploitation (SOMEX), in which the FBI or local police obtain, compile, and systematize information from social media for the purpose of monitoring and targeting activists.

29.     During the course of Rogers' infiltration, CSPD learned about the planned July 31, 2021 housing march. As CSPD gathered information, officers decided that, if given the opportunity at the march, they would arrest Chinook Center leaders and other activists, including Jon Christiansen and Shaun Walls.  CSPD officers wanted to arrest Chinook leaders because of their general animus toward Chinook and other activists CSPD perceived to be associated with past demonstrations, including those at the home of the CSPD officer at Pulpit Rock, and the particular message of the Chinook Center in juxtaposing the sorry state of housing policy with the City's sesquicentennial celebration.

30.     CSPD Commander John Koch was in charge of the CSPD response to the 2021 housing march. He had also played a significant supervising role in investigating activists following the 2020 protest at the Pulpit Rock neighborhood.

31.     In a report, Koch wrote that the housing protest was "being headed by the Chinook Center and Shaun Walls, who was affiliated with the center." In Koch's view, the Chinook Center and Walls had been "instrumental" in the protest at the Pulpit Rock neighborhood the prior year (which Koch called a "riot"), even though neither Chinook nor any of its leaders had been charged with any crimes associated with the protest.

32.     With respect to the July 31, 2021 housing march, Commander Koch declared that he was "concerned protesters would engage in unlawful activity designed to disrupt the public celebration." This "concern" was entirely inconsistent with the stated intentions of the

marchers to exercise their constitutionally protected rights of free speech and expression, to bring awareness to the housing crisis in Colorado Springs, and not to disrupt anything.

33.     On July 31, 2021, as the activists began to assemble in a local park before the housing march, CSPD officers sat in police cruisers waiting for the march to begin and observed the gathering activists. While in their vehicles waiting, CSPD officers reviewed a printout containing photos of activists they hoped to arrest. On information and belief, this printout was the result of the SOMEX program, supplemented by information obtained from the secret infiltration and surveillance of the Chinook Center and other activists by undercover CSPD officers.

34.     Before the housing march had even started, CSPD Officer Scott Alamo sat in his police cruiser and spoke to his fellow officers. His body camera was recording this discussion. While Officer Alamo reviewed the report with photos of the Colorado Springs activists, he remarked to his fellow officers: "Well, boys. We sit, we wait, we get paid."

35.     The officers proceeded to share with each other fantasies of violence toward the protestors. When referring to media observing the crowd of activists, one officer asked: "why the fuck are they paying attention to them?" Another officer responded: "Because they care. We fucked up somebody from the media." Later, because they were worried that the housing march might disrupt the sesquicentennial parade, another CSPD officer remarked: "Just get on that bullhorn and be like, 'Hey if y'all would like to see a parade and like to see these motherfuckers to quit interrupting it, just handle that for us… stone 'em all to death." A CSPD officer responded: "Call us when we need to collect the bodies."

36.      After remarking that there were undercover informants and plainclothes officers in the group of protestors, and as he looked at a photo of Jon Christiansen (one of the leaders of the Chinook Center), Officer Alamo remarked "Christiansen . . . was the white guy? The Professor?" His comment, likely referring to Christiansen's position as a sociology professor at the University of Colorado – Colorado Springs, reveals Officer Alamo's background knowledge regarding details of Christiansen's life. Continuing to look at photos of activists, Officer Alamo proclaimed: "Boot to the face. It's going to happen."

37.      Officer Alamo later stated: "Should we EPSO SWAT the shit outta these dudes and just throw flash-bangs at everyone?" Another CSPD officer responded with "Stingers!" referring to the less-lethal Stinger grenades that police have used on protestors. Officer Alamo responded approvingly and affirmatively with "Ah, Stingers!"

38.      A CSPD lieutenant, Chacon, reported that "the information given to me was that if the group began to march in the street, we would be making contact and effecting arrest." On information and belief, typical police practice is to seek compliance from protestors exercising their First Amendment rights, as opposed to "effecting arrest." But CSPD wanted to make arrests at this march—of community leaders in particular—to punish Chinook and affiliated activists for their First Amendment-protected activities.

39.      Eventually, after gathering at the local park, the protestors began their march for housing. At various points, because there were no sidewalks, and streets were already blocked by police vehicles, some marchers walked in the street.  When police officers made requests that marchers get out of the street, the marchers complied with the requests.

40.     Notwithstanding the marchers' compliance with the police request to get out of the street, CSPD commander Koch ordered that arrests be made. Commander Koch acknowledged, "Although I was advised shortly thereafter the protesters had gotten back on the sidewalk and off South Nevada Avenue, I directed their arrest for the previous obstruction of traffic."  This decision was consistent with CSPD's plan to send a message by arresting and targeting particular activists, including Chinook leaders.

41.     CSPD officers then tackled and subsequently arrested Chinook Center leader Shaun Walls, who had been at the front of the march carrying a white flag emblazoned with the Chinook Center logo. Jon Christiansen, another Chinook leader, was also arrested. Although police estimated that there were at least 50 other individuals who had walked in the street, the CSPD officers focused their attention on the two leaders of the Chinook Center to send a message in retaliation for their First Amendment-protected activities.

42.     Ms. Armendariz was walking her bicycle in the bike lane near the front of the march when police tackled Mr. Walls. She was wearing a blue bike helmet, sunglasses, and a "Housing is a human right" t-shirt. She witnessed police officers tackle and jump on Shaun Walls. She saw another officer in riot gear running towards her. Ms. Armendariz then dropped her bike. The bike landed between Ms. Armendariz and the officer. The officer avoided the bike and continued toward the protestors untouched by Ms. Armendariz's bicycle. The encounter was captured on multiple CSPD police body-worn cameras, as well as a CSPD overhead drone.

43.     Although officers did not arrest Ms. Armendariz at the scene, CSPD subsequently decided that dropping the bicycle in front of the officer was a case of felony attempted aggravated assault on a police officer, identified as Officer Anthony Spicuglia.

11

44.     Several weeks later, in a presentation to the City Council, the Colorado Springs City Attorney said the woman who "threw her bicycle in front of an officer" had not yet been identified, but that police were working on it.

**CSPD Seeks Warrants for Chinook Center's Facebook Messages**

45.     A few days after the housing demonstration, CSPD sought search warrants for "All Facebook Messenger chats tied" to the Chinook Center Facebook page.

46.     The Chinook Center's Facebook Messenger chats were private, confidential, and not available to the public.  The private chats provide an opportunity for political organizing, debate, and advocacy among Chinook members.

47.     The affidavit did not even purport to establish probable cause for a warrant to issue.

48.     The sole justification in CSPD's affidavit seeking disclosure of the Chinook messenger chats was that "the protest was organized" by the Chinook Center and that its Facebook page contained details regarding the March for Housing.

49.     There was no indication as to why the private messages would contain relevant evidence beyond the police's assertion that they could gain "material evidence in this case."

50.     The affidavit identified no particular crime or even person under investigation.

51.     The affidavit noted only that, "[i]t is your affiant's experience people involved in illegal demonstrations use social media to organize planned events."

52.     The affidavit did not specify what was "illegal" about the constitutionally protected housing march.

53.     Had CSPD known who or what it was looking for in connection with its investigation, its officers could have limited the scope of the application for search warrant accordingly, rather than rummage through the communications of a hub of political organizing.

54.     The only limitation on the scope of the warrant for Chinook Center's Facebook records was the time period of July 27 to August 2, 2021.

55.     Defendant Steckler drafted, and Detective Otero reviewed and approved, the affidavit submitted to the state district court in support of the warrant to search the Chinook Center's Facebook messages.

56.     The warrant was served on Facebook, which complied with the warrant.  There was no prior notice provided to the Chinook Center or any Chinook member.

**CSPD Identifies and Arrests Ms. Armendariz**

57.     Defendant Summey was assigned the task of identifying the person who dropped her bike at the housing march. Summey pored over the body worn camera footage and the CSPD's overhead drone footage. He conducted multiple internet searches.  He found photographs and other information showing that Ms. Armendariz was the person who dropped her bike in front of the officer at the housing march.  He also found information indicating that she had been politically active and that she had some connection to the Chinook Center.  On August 6, 2021, Defendant Summey submitted an affidavit to obtain an arrest warrant for Armendariz, as well as a warrant to search her home.

58.     Defendant Summey's arrest warrant affidavit is rife with his derogatory opinions and assertions about First Amendment-protected activities, including those of the

Chinook Center and other activists in Colorado Springs. Throughout, Defendant Summey equates political expression, activity, and associations with criminality.

59.     Defendant Summey asserted in the affidavit that he has participated in investigations regarding "illegal" protest activity, but he does not provide any explanation of what made certain protest activity "illegal."

60.     Defendant Summey asserted in the affidavit that he has "become familiar" with people who are "regularly involved" in what he called "illegal protest activity." Among those people, Defendant Summey asserted, are "members and associates of the Chinook Center." Here again, Defendant Summey did not explain what made any particular protest activity "illegal." He did not describe which "members and associates" of the Chinook Center he was referring to, identify any prior wrongdoing on their part, nor explain how they "regularly" engaged in undefined "illegal" protest activity.

61.     On information and belief, among the ways that Defendant Summey "became familiar" with members of the Chinook Center and their First Amendment protected activities was through the undercover spying operation and infiltration of the Chinook Center by CSPD officer April Rogers.

62.     Defendant Summey characterized the Chinook Center as "a local umbrella organization that is the central hub for multiple political activist groups and their members."

63.     Defendant Summey stated that the Chinook Center had posted on social media that a march was planned regarding housing in Colorado Springs for July 31, 2021. Summey included a snip from the Chinook Center social media site stating that "Housing Is A Human Right"; that "The Housing Crisis in this city can't be ignored any longer"; and that "We are

going to March on July 31 and we'll also be distributing meals, personal items, and tents to our unhoused community members who bear the worst of the crisis daily."

64.     In the arrest warrant affidavit, Defendant Summey explained that he found that Ms. Armendariz was a Facebook friend of Shaun Walls, and that the photos on her personal Facebook page matched police photos of her from the demonstration. He confirmed her identity by checking her driver's license photograph. He also checked her utilities account, her vehicle registration, and confirmed her mailing address.

65.     Defendant Summey supported his identification of Ms. Armendariz by the photos on her Facebook profile.  In the affidavit, Summey stated that he located a photo on Ms. Armendariz's Facebook profile in which she was wearing a helmet and notes that, "the helmet that is light blue in color and gets darker toward the bottom."  Summey concluded that the helmet "appears to be the same helmet worn by the suspect that attempted to assault Officer Spicuglia." Summey included the following photo in the affidavit:

Your Affiant located the following photo on Armendariz's open Facebook profile, dated July 3rd, 2021.  Please note the helmet that is light blue in color and gets darker towards the bottom.  This helmet appears to be the same helmet worn by the suspect that attempted to assault Officer Spicuglia.



66.      Defendant Summey also located a photo on Ms. Armendariz's Facebook page that showed her wearing shoes that he concluded "appear to be the same shoes worn by the suspect that attempted to assault Officer Spicuglia" and that Ms. Armendariz had visible tattoos on her hip "in the same location the suspect has a tattoo." Summey included the following photo:

On Armendariz's Facebook page, Your Affiant located a photo from RISE Southeast showing Armendariz standing in front of a camera dated July 19th, 2021. Your Affiant noted Armendariz is on multiple photos associated to RISE Southeast. The photo below shows Armendariz wearing gray Nike shoes with a white sole that appear to be the same shoes worn by the suspect that attempted to assault Officer Spicuglia. Your Affiant would also note that tattoos are visible on Armendariz's hip in the same location the suspect has a tattoo.



67.      Defendant Summey included another photo from Ms. Armendariz's Facebook profile in which he asserts that she is "again wearing the same shoes and helmet as the female that attempted to assault Officer Spicuglia." He also asserts that: "the bicycle Armendariz is holding is purple in color with straight handlebars that are white on the grips. The bicycle also has a green sticker just below where the handlebars connect to the bicycle. The bicycle appears to be the same bicycle the female attempted to assault Officer Spicuglia with." He included the following photograph:

The following photo is also from RISE Southeast, and is located on Armendariz's Facebook profile. Armendariz appears to be again wearing the same shoes and helmet as the female that attempted to assault Officer Spicuglia. Please note the bicycle Armendariz is holding is purple in color with straight handlebars that are white on the

D0212021CR004694                                    DISCOVERY PAGE 185

Attachment A
Page 10 of 24

grips. The bicycle also has a green sticker just below where the handlebars connect to the bicycle. The bicycle appears to be the same bicycle the female attempted to assault Officer Spicuglia with.



68.     Defendant Summey's affidavit specifically calls out the political messages that protestors had on their clothing. He notes that some protestors wore red shirts with the words "Housing is a Human Right."

69.     Following his observation that "several" protestors carried "red flags," he asserts: "Your Affiant would note that the red flag is significant in that it is a radical political symbol, and designates this march, which ultimately was declared unlawful, as revolutionary and radical in nature."

70.     Defendant Summey's statement that the march was "declared unlawful" is a false statement. There was no such declaration. Detective Summey's statement that the waving of a red flag during a march "designates" it as "revolutionary" and "radical" in nature is also false. Detective Summey provided no explanation as to why believing that "Housing is a Human Right" or that "distributing meals, personal items, and tents to our unhoused community members" could be equated with "revolution." Summey's focus on the alleged "political symbol" of a red flag shows disregard for the First Amendment protected-activity of the people. Summey also failed to note that Shaun Walls had been carrying a white flag at the front of the housing march or the significance of having both red and white flags at the march.

71.     Defendant Summey's affidavit demonstrated that he was using indiscriminate internet research to skew his political analysis of red flags. His affidavit cites and quotes the website "Age of Revolution" as providing the following supposedly erudite explanation of red flags: "Today the red flag has, predominantly, become a symbol of socialism and communism. Its European origins date back to the Middle Ages, when a red streamer flying from the mast of a

warship signaled a willingness to fight to the death, with no surrender. But its radical political roots lie firmly in the Age of Revolution."

72.     Defendant Summey does not explain why he chose to include a random website explanation purporting to give a radical meaning to the use of red flags in his affidavit to arrest and search the home of Ms. Armendariz, who was accused of a split-second decision to drop her bike in front of an officer at a housing march. On information and belief, Summey intended to sensationalize the alleged bike-dropping crime by tying it to "socialism," "communism" and a "willingness to fight to the death with no surrender."

73.     Defendant Summey could have cited, but did not, the Merriam-Webster dictionary definition of red flag, which includes "a warning signal or sign" and "something that indicates or draws attention to a problem, danger, or irregularity."

74.     Defendant Summey also asserted that he located a professional Twitter handle for Ms. Armendariz "in which she appears to appeal for social justice causes." Summey does not explain what crime is typically associated with "appeal[ing] for social justice causes" or why such information is relevant for CSPD's request to arrest Ms. Armendariz for dropping her bike.

75.     Defendant Summey reproduced a photo from Ms. Armendariz's Twitter profile:



Attachment A
Page 12 of 24

Your Affiant also discovered a professional Twitter profile for Armendariz, in which she appears to appeal for social justice causes. Please see photo of Armendariz's Twitter profile:

76.     The Twitter profile stated: "Professional truth teller. Here for the worker. My sarcastic tweets about yt supremacy and TX history make GOP racists BIG MAD. Views are mine alone."

77.     Defendant Summey once again relied on political speech and First Amendment protected activities, this time from Ms. Armendariz's Twitter profile, to purport to establish evidence of nefarious intent.

78.     Defendant Summey noted Ms. Armendariz's use of the phrase "yt supremacy," and stated that he "was unfamiliar with the term 'yt.'"

79.     Not to be deterred, Defendant Summey found a definition for "yt folx" using a website he describes in his affidavit as "dictionary.com." Despite the fact that Ms. Armendariz's Twitter profile does NOT use the term "yt folx," Summey pressed ahead. His affidavit included the following quote:

In her profile, Armendariz references "yt supremacy". Your Affiant was unfamiliar with the term "yt", and using dictionary.com found the following definition for "yt folx":

"The *yt* in *yt folx* appears to stem from the slang term *whitey*. *Whitey*, evidenced since at least the 1830s, has been used by black Americans to disparage white people, especially implying oppression and racial discrimination. By at the early 2000s online, *whitey* was spelled phonetically at *yt*." The information can be found at https://www.dictionary.com/e/slang/yt-folx/.

80.     Defendant Summey did not state that this language comes from the "Slang Dictionary" of dictionary.com.

81.     Moreover, Defendant Summey did not include another part of the dictionary.com definition of "yt folx" – the part of the definition that comes first and before the quote he does include. Dictionary.com begins its definition by answering the question "What does Yt Folx Mean?" and explains that the term "yt folx" as an "often humorous" term used "to call out white privilege, racism, or cultural appropriation": "*Yt folx* is internet slang for 'white folks.' Sometimes serious but often humorous, *yt folx* is typically used by people of color, usually black Americans to call out white privilege, racism, or cultural appropriation." (available at dictionary.com/e/slang/yt-folx/).

82.     Defendant Summey did not explain whether it is part of CSPD law enforcement training and policy to use dictionary.com as part of an investigation, to omit material parts of internet slang definitions when they are used, or to use internet definitions to ascribe discriminatory motives to suspects based on their online speech objecting to white supremacy.

83.     Then, using only part of the pseudo-definition from the "Slang Dictionary" of dictionary.com of a term that Armendariz did not use, Defendant Summey ascribed racist motives to Armendariz's use of the term "yt supremacy" and claimed that she had a "disdain for white people":

It appears Armendariz uses the term "yt" in an attempt to disparage white people, showing her disdain for white people.  Please note that the officer she attempted to assault was a white male.

84.     Defendant Summey did not attempt to show how opposition to white supremacy could be equated to a "disdain" for white people.

85.     Defendant Summey then devoted two pages of the affidavit to material from Ms. Armendariz's LinkedIn account, which revealed that she worked as a Regional Representative for Senator Bennet. Summey confirmed this by further checking a legislative website.

86.     Defendant Summey again sought to use Ms. Armendariz's constitutionally protected speech and associations as a relevant basis for the warrant, asserting that "Armendariz appears to be very active politically," and claiming that the protest on July 31, 2021 was "politically motivated." Summey repeated the false assertion that the protest "turned unlawful."

**Defendant Summey Submits and Defendant Steckler Approves an
Unreasonable Application to Seize Ms. Armendariz's Devices**

87.     At the same time they obtained an arrest warrant for Ms. Armendariz, on August 6, 2021, Defendant Summey submitted and Defendant Steckler approved an affidavit to obtain a search warrant to search Ms. Armendariz's home and seize the items they determined she was wearing or using at the housing march: her blue bicycle helmet, her red shirt with "Housing is a Human Right" written on it, her gray Nike shoes with white soles, and her purple bicycle.  Defendants also sought authorization to take a photograph of the tattoo on Ms. Armendariz's right hip/thigh.

88.     CSPD, however, did not stop at obtaining a warrant for this particularized, specific evidence.  Instead, Defendants obtained a search warrant for all "digital media storage

devices" associated with Ms. Armendariz, including all "phones, computers, tablets, thumb drives, and external hard drives" they could find in Ms. Armendariz's home.  In other words, CSPD sought a general warrant to seize every electronic device they could find at Ms. Armendariz's home with absolutely no probable cause that such devices would contain specific, particularized evidence of a particular crime, much less the particular crime—attempted assault of a police officer—of which she was accused.

89.     On August 18, 2021, CSPD took Ms. Armendariz into custody outside of her residence and conducted a search of her home.

90.     During the search of Ms. Armendariz's home, CSPD officers found and seized the specific items identified in the search warrant:  her blue bike helmet, the red "Housing is a Human Right" shirt, and the gray Nike shoes with white soles.

91.     During their roaming search, CSPD officers also found and seized three cell phones, two computers, and an external hard drive from Ms. Armendariz's home.  One of the computers had a sticker indicating it was a work computer and that it was the property of US Senator Michael Bennet's Office and US Senate Property.  Defendant Summey asserted that "people often engage in personal communications with their work devices," so he seized that computer as well.

92.     Defendant Summey saw a bicycle in the back of Ms. Armendariz's vehicle. Summey asserted that the bicycle was purple in color with a green sticker and that the bicycle "clearly matched the bicycle that was used in the attempted assault on Officer Spicuglia." CSPD then seized and towed Ms. Armendariz's vehicle and subsequently seized the bicycle.  Defendant Summey determined that the bicycle had damage and scratch marks to the outside of the left

handlebar and that the bike during the incident had stuck the ground hard on the left side of the handlebars.

93.     Accordingly, after seizing the clothing, helmet, and shoes that Ms. Armendariz was wearing at the protest, as well as the purple bicycle she had at the march, and photographing her tattoo, CSPD had no doubt that Ms. Armendariz was the person who had dropped her bicycle at the march.

94.     But Defendants would not stop there. They had Ms. Armendariz's computers, cell phones, and hard drive and they would try to comb through her electronic world, with no reasonable suspicion and with no particularity, to continue their campaign of surveilling and seeking to suppress political speech and expression.

### Defendant Summey Submits and Defendant Steckler Approves an Unreasonable Application to Search the Contents of Ms. Armendariz's Devices

95.     On August 20, 2021, after conclusively determining that Ms. Armendariz was the person who had dropped her bike in front of the officer at the rally, Defendant Summey submitted an affidavit to obtain a search warrant to search Ms. Armendariz's three cell phones, her two computers, and her external hard drive.  Summey's affidavit to search the devices repeated the litany of conclusions from his arrest affidavit and his affidavit to seize the devices, but also added more.

96.     Defendant Summey requested a warrant to search Ms. Armendariz's six digital devices for the following reams of personal data:

> Photos, videos, messages (Whether they be text messages or any application on the phone or computer capable of sending messages) emails, and location data, for the time period of 6/5/2021 through 8/7/2021 that are determined to be relevant to this investigation. This time period would allow for any planning leading up to the crime, the period when the

crime took place, and the subsequent taking of credit for committing a violent act against a police officer.

And key word search of the devices for the following words:

Police, officer, cop, pig, bike, bicycle, attack, assault, 1501 celebration, protest, housing, human, right, yt, Chinook, Center, Jon, Jonathan, Sam, Samantha, Christiansen, Crustyansen, Chrischeeansen, Shaun, Walls, as these terms would be relevant to the investigation regardless of the time period in which they occurred.

97.     On information and belief, the goal of Defendant Summey's affidavit was to obtain permission to search Ms. Armendariz's digital devices not for further proof she was the protestor who dropped her bike, but for information about the Chinook Center, its activities, and her own political expression.

98.     The reasoning in Defendant Summey's affidavit purports to justify searching Ms. Armendariz's devices primarily on the basis of her affiliation with the Chinook Center and Summey's animus toward their protected First Amendment- protected views and activities.

99.     On information and belief, the police search of Ms. Armendariz's devices and seizure of Chinook's private chats were intended to limit the Chinook Center's ability to serve effectively as what Summey characterized as a "central hub" for "political activist groups."

100.      Relying on cherry-picked sources, unfounded assumptions, and leaps of logic, Defendant Summey repeated the spurious conclusions of malintent from his arrest affidavit regarding his observations of Ms. Armendariz and other activists' First Amendment-protected expression, activities, and associations.

101.     Defendant Summey's affidavit wholly failed to establish probable cause that Ms. Armendariz's digital devices would contain evidence of any crime, let alone the particular

crime for which she was charged. Instead, Summey's explanation for law enforcement interest in the content of Ms. Armendariz's data was based entirely on her social and political associations.

102.    Moreover, Defendant Summey sought to justify the search of Ms. Armendariz's devices through vague and conclusory assertions, which if accepted, would justify a police fishing expedition through the personal electronic data of any person going about their ordinary lives.

103.    Defendant Summey asserted that based on his familiarity with "people who protest as part of a group," and his "training and experience," he "knows that people who engage in illegal protest activity frequently carry their phones with them to take photos of their activity and message others who are also participating in illegal protest activity."

104.    Defendant Summey did not explain how these practices distinguished people engaged in so-called "illegal protest" activity from the other 300-plus million Americans who carry their phones and use them to take photos of their activities and message others. Nor could he: Summey's purported justification for searching Ms. Armendariz's phones and computers would serve as a basis to search the phones and devices of any person charged with any crime.

105.    Defendant Summey further claimed that his "training and experience" led him to conclude that "people who commit illegal activity in furtherance of the ideology or goals of anarchist or anti-government groups share information with others through messaging applications, emails, or text in order to take credit for their actions and gain standing or notoriety in such groups" and "take videos or photos of themselves or others engaged in illegal activity, or engaged in group activities leading up to the illegal activity." Summey failed to explain what training or experience produced these conclusions.

106.     He also failed to point to any evidence that Ms. Armendariz was part of "anarchist or anti-government groups," or to explain how dropping her bike was "in furtherance of the ideology or goals" of such unspecified groups. And he again did not explain how such sharing differs than the behavior of every other American with a phone.

107.     Defendant Summey falsely asserted that Ms. Armendariz's bike-dropping was carried out "in furtherance of the ideology or goals of anarchist or anti-government groups."

108.     Defendant Summey sought authorization to search her devices based on her political expression, including what Summey alleged was her "connection to the activist community" and her purported "closeness with Christiansen and Walls."  Such closeness, Summey alleged, was based on their alleged interest in similar social or political causes, including attending a protest and Armendariz appearing on a podcast to discuss social issues.

109.     Defendant Summey reproduced some social media posts by Shaun Walls that were critical of police. He mentioned the protest at Pulpit Rock that Chinook leaders Christiansen and Walls attended.  Defendant Summey continued his focus on political speech and political association as a basis to search the devices of Ms. Armendariz.

110.     Not only did Defendant Summey point to Ms. Armendariz's political and social ties as the sole motivation to search her data, he also sought broad authority to search *all* of her devices rather than limit the scope of the search to any subset. To justify a general search through all of Armendariz's electronic data, Summey asserted that he was "aware that people regularly attach their phones to their computers, and use their computers to back up their phones, or transfer photos from their phones to save space on their phones" and "that people store digital data on numerous devices, to include tablets, thumb drives, and external hard drives."

111.    Defendant Summey signed the Application and Affidavit and stated after the signature line that he was "Employed by" the Colorado Springs Police Department and that his position was Task Force Officer. The Application and Affidavit provided that the "Agency" for whom it was submitted as "Colorado Springs Police Department" and gave "Agency Number 21-29044."

112.    Defendant Summey prepared and submitted the 24-page affidavit that was Attachment A to the Application and Affidavit for Search Warrant, seeking a warrant to search for and extract data from Ms. Armendariz's digital devices. In the affidavit, Summey stated that he was a Police Officer for CSPD and that he had been employed by CSPD for over 6 years. He also noted his assignment to the FBI Joint Terrorism Task Force.

113.    On information and belief, CSPD Detective B.K. Steckler reviewed and approved both the Applications and Affidavits for Search Warrant that Defendant Summey prepared for Ms. Armendariz's devices, thereby authorizing and causing an unlawful search and seizure.

114.    On information and belief, Detective Steckler was Defendant Summey's supervisor for purposes of the Applications and Affidavits for Search Warrant to seize and search Ms. Armendariz's devices.

115.    Detective Steckler initialed the affidavits as Defendant Summey's supervisor and gave his badge number as 2145.

116.    On August 20, 2021, Colorado Springs Deputy District Attorney R. Short filed with the district court in El Paso County a request for sealing the search warrant for the search of Armendariz's digital devices.

117.     The request recounted that the criminal case against Ms. Armendariz was initiated by CSPD and given Case Number 21-29044 in El Paso County Colorado.

118.     The state court approved the request and issued the warrant.

119.     For the bike dropping incident at the housing march, Ms. Armendariz ultimately reached a plea agreement for obstructing a peace officer, received a deferred judgment, and successfully served six months of unsupervised probation.

### CPSD and the FBI Unlawfully Copy and Search Ms. Armendariz's Private Data

120.     The Fourth Amendment requires that a search warrant must describe the things to be seized with sufficient particularity to prevent a general, exploratory rummaging in a person's belongings.

121.     The particularity requirement ensures that a search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause.

122.     Warrants that authorize police to search for documents and digital data, as opposed to distinctive physical objects, require greater care in enforcing the particularity requirement because of the potential they carry for a very serious intrusion into personal privacy.

123.     The particularity requirement is even more important with respect to searches of computers and cell phones because of the police's ability to conduct a wide-ranging search into a person's private affairs.

124.     Where the materials sought to be seized may be protected by the First Amendment, as was the case with Ms. Armendariz's devices, the requirements of the Fourth Amendment must be applied with scrupulous exactitude.

125.     As the U.S. Supreme Court has recognized, the physical realities that used to limit potential police invasions of privacy do not apply when it comes to cell phones and similar devices, which can store enough personal information in a pocket to reconstruct "the sum of an individual's private life." *Riley v. California*, 573 U.S. 373, 394 (2014).  The Tenth Circuit similarly recognized that "[t]he modern development of the personal computer and its ability to store and intermingle a huge array of one's personal papers in a single place increases law enforcement's ability to conduct a wide-ranging search into a person's private affairs, and accordingly makes the particularity requirement that much more important."  *United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir. 2009).

126.     In violation of Ms. Armendariz's constitutional rights, CSPD enlisted the help of the FBI to unlawfully seize, search, and copy ***all*** of Armendariz's personal devices.

127.     Ms. Armendariz's digital devices were taken to an FBI-run forensic computer laboratory, the Rocky Mountain Regional Computer Forensics Laboratory (RMRCFL). On information and belief, the role of the RMRCFL is to extract the data from the digital devices that the warrant orders to be extracted. On information and belief, it begins by making an exact digital copy of the data on the digital device.

128.     CSPD and the FBI searched these devices for the words "human" "right" "housing" "protest" and "police," among many other terms, without any time limitation whatsoever.  They also seized and reviewed ***all*** of Armendariz's private personal photos, videos, text messages, and emails for more than a two-month period, again unlimited by subject or topic.

129.     On information and belief, both CSPD and the FBI continue to retain all of the data and information copied from Ms. Armendariz's phones and devices, even though they have no legitimate need or basis to do so.

### The Custom, Policy, and Practice of the City of Colorado Springs

130.     The unconstitutional search warrants targeting Chinook Center and Ms. Armendariz's digital devices were obtained by Colorado Springs police officers as part of a custom, policy, and practice of CSPD and the City of Colorado Springs.

131.     Pursuant to that custom, policy, and practice, when CSPD officers conduct a post-event investigation of offenses that occurred during a demonstration or protest, police seek broad-reaching warrants to search digital devices and social media accounts of participants and even non-participants who associate with persons who participated. Instead of narrowly targeting information and evidence relevant or necessary for a criminal prosecution of particular, specified crimes under investigation, these warrants broadly seek information about activities, expression, views, and associations that are protected by the First Amendment and Article II, sections 10 and 24 of the Colorado Constitution. In doing so, they fail to comply with the constitutionally required standard of scrupulous exactitude that governs warrants seeking First Amendment-protected materials.

132.     Pursuant to this custom, policy, and practice, CSPD procures warrants authorizing unreasonable searches and seizures that fail in multiple ways to comply with the particularity requirements of the state and federal constitutions. They contain insufficient limitations on the scope of the search. The warrants are not as specific as the circumstances and

the officers' knowledge would allow. In addition, the scope of the information or evidence sought exceeds whatever probable cause may be established in the affidavit seeking the warrant.

133.    The latter flaw is starkly evident in CSPD's affidavits seeking warrants to search digital devices and social media messages in pursuit of individual participants who may have committed a violation in connection with a public protest. CSPD officers routinely and consistently fail to establish any concrete specific factual nexus between the evidence they seek and the digital device or social media account they seek to search. Instead, CSPD officers assert that they know, allegedly from their "experience" and "training," that persons who engage in the activity under investigation, whether it be a violation of law or mere participation in a public exercise of constitutional rights, regularly send and receive photos, messages, and other information through electronic communications. Such broad generalizations are untethered to any specific facts about a particular person, a particular electronic device, or a particular social media account. Given the use of smart-phones by more than 300 million Americans, the CSPD's custom, policy, and practice would support a search of the electronic communications of anyone who has any association with any event that prompts an investigation. Searches based on such fact-free generalizations that apply universally rather than specifically to the individual case, are not reasonable searches; they are not based on probable cause to believe that evidence will be found in the particular device or account to be searched.

134.    In seeking these overbroad warrants to obtain information about constitutionally protected political associations, CSPD officers regularly seek to obtain information about all participants in a protest, rather than focusing solely on particular individuals whose actions may have violated the law. In their warrant applications, CSPD officers regularly mischaracterize a

demonstration where some individuals violate the law as an "illegal protest" or a "riot," characterizations that unjustifiably implicate the organizers and all the participants, and they attempt to justify casting their overbroad net by asserting, vaguely, that the wide net they cast may identify "additional suspects."

135.    Examples of CSPD's custom, policy, and practice of seeking overbroad warrants to search digital devices include efforts to obtain information that would reveal who organized a protest, who participated in a protest, who communicated with persons who organized or participated in a protest, and the substance of those communications, without regard to whether that information is evidence of crime.

136.    CSPD's policy and practice is illustrated by its officers' investigation of criminal offenses that some individuals committed at a protest on August 3, 2020. On that date, activists held a demonstration to commemorate the one-year anniversary of the shooting and killing of De'Von Bailey at the hands of Colorado Springs police officers. The location was a residential neighborhood that included the home, on Pulpit Rock Drive, of the officer who was accused of shooting and killing De'Von Bailey.

137.    More than 100 people participated in the event, which included signs, banners, chants, and marching in the street. Some participants were armed. The group stopped in front of the officer's home, where the chanting continued and various participants made speeches. About twenty minutes into the demonstration, a vehicle approached on Pulpit Rock, but it stopped, as some participants were standing in the street. According to police, at least two of the persons carrying weapons stood in front of the vehicle. One participant positioned his own vehicle perpendicular to the curb so as to block the approaching vehicle's passage. A few minutes later, a

second vehicle arrived and stopped next to the first one. Its passage was also blocked, both by people in the street and the demonstrator's perpendicularly positioned vehicle. After a few additional minutes of confrontation, the participant moved his vehicle and the two blocked vehicles made their way through the crowd. The confrontation lasted less than ten minutes.

138.     In CSPD's later-written reports, (but not at the scene), CSPD asserted that the protest had become a "riot" pursuant to C.R.S. § 18-9-101.

139.     No arrests were made at the event, but CSPD launched an intensive investigation. Six weeks later, Colorado Springs police arrested two persons for alleged "riot" and "menacing." CSPD officers continued their investigation of the De'Von anniversary commemoration for much of the following year. They obtained warrants for physical searches of homes and vehicles; they obtained warrants to search cell phones and other digital devices; warrants to search private information on social media accounts, and additional warrants issued to cell phone companies for customer data records. The applications to search social media and digital devices reflect CSPD detectives' hearty appetite for information that would reveal who participated in the protest, who communicated with persons who participated in the protest, and the substance of those communications.

**Search of E.B.'s phone**

140.     Almost six months after the De'Von Bailey commemoration, CSPD determined that M.A. was one of the participants who stood in front of the blocked vehicles while armed with a gun. Detectives seized not only M.A.'s phone, but also the phone of M.A.'s partner, E.B. The CSPD's affidavit to search E.B.'s phone illustrates CSPD's unconstitutional custom, policy,

and practice of obtaining dragnet warrants to intimidate and chill First-Amendment protected activity.

141.     CSPD had no evidence that E.B.had attended the protest. The application to search E.B.'s phone was based on her perceived romantic relationship with M.A. Based on her relationship with M.A. CSPD asserted that E.B.'s phone would contain material evidence. Such a theory would justify seizing and searching the phones and computers of anyone in a relationship with someone accused of any offense, in violation of the Fourth Amendment. Even worse, CSPD sought and obtained a warrant to search for **_all_** emails, internet searches, voicemail, text messages, logs of incoming and outgoing calls, photos, videos, contact and phone book information. The warrant did not limit the search to any specific crime and was for a six-month period of time. This is precisely the type of general search warrant – and here, someone not even accused or suspected of an offense – that is prohibited by the state and federal constitutions' prohibition of unreasonable searches.

### Search of Empowerment Solidarity Network

142.     CSPD's warrant applications also reflect a custom, policy, and practice of assuming, in the absence of evidence, that individuals who are suspected of committing an offense in the course of a protest or demonstration, are acting at the direction of the organizations that initiated the event and justify dragnet warrants of the organizations themselves. That unfounded assumption permeates the affidavits seeking authorization to search Chinook Center's Facebook account and Armendariz's digital devices and violates long-established constitutional law, including *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982).

143.     The same unjustified assumption infects CSPD applications for search warrants obtained in connection with the De'Von anniversary protest. CSPD named the Empowerment Solidarity Network as an organizer of the August 3 demonstration, and it sought a warrant to search the organization's Facebook records. The affidavit for search warrant contains no information linking the Empowerment Solidarity Network with any criminal activity. The sole basis for asserting that there was probable cause that the Facebook records would provide evidence of criminal activity was the group's role in announcing the protest and the stated intent of a person, identified as a leader of Empowerment Solidarity Network, to plan similar events in the future.

144.     The affidavit explains that CSPD sought "to identify persons that were in contact with the Empowerment Solidarity Network in the weeks and days leading up to, during, and after the event that took place on 08/03/2020." The affidavit further explained that obtaining the Facebook messages "will assist with better understanding the event planning process, specifically to determine if the armed subjects were directed to use intimidation and force towards uninvolved citizens travelling through the area, and to help identify the unknown actors." The warrant sought all Facebook records for a six-week period, including listing of Facebook "friends" of the organization and all private messages. Here, again, CSPD's efforts were designed to and would have the natural effect of intimidating and chilling First-Amendment protected activity.

**Search of membership lists of expressive/advocacy organizations**

145.     Another CSPD application for a warrant targeting First Amendment associations sought authority to seize and search a zippered notebook found during a search of

the home of one of the suspects for whom CSPD obtained an arrest warrant. According to the CSPD affidavit, the notebook included "organizational information" and "rosters, contact information, and personal identification" of members of two groups: the John Brown Gun Club and Redneck Revolt. The affidavit claimed that both groups were ""a far-left political group that organizes predominantly among working-class people. The group supports gun rights and members often openly carry firearms. The group's political positions are anti-capitalist, anti-racists, and anti-fascist."

146.     The affidavit clearly identified the two groups as associations engaged in political expression. It did not link either group to any criminal activity whatsoever, nor did it link either group to the events of August 3, 2020. Nevertheless, the affidavit asserted that the documents in the zippered notebook "would be critical material evidence" to identify suspects "who have yet to be identified and charged from the riot that occurred in Colorado Springs, CO on 08/03/2020." This is another example of CSPD's custom, policy, and practice of using unconstitutional warrants in an attempt to chill and suppress protected speech, assembly, and rights of association.

### Warrant for names of participant's Facebook friends

147.     Even when CSPD detectives seek a single clearly identifiable piece of evidence, they draft a warrant far too broad in scope that intrudes unjustifiably on private communications and associations protected by the First Amendment and Colorado's Freedom of Speech provision. Plaintiff Jacqueline Armendariz posted a nine-minute video of portions of the De'Von anniversary protest on her Facebook page. Detectives wanted to obtain an "official" copy of the video from Facebook to provide to the prosecution as potential evidence. Instead of drafting a

warrant that was narrowly tailored to obtain the specific video they sought, their warrant lists a full page of categories of records that Facebook was commanded to produce, including Ms. Armendariz's private listing of Facebook friends and their Facebook IDs. These examples, and others, demonstrate CSPD's custom, policy, and practice of using unconstitutional warrants in an attempt to chill and suppress protected speech, assembly, and rights of association protected by the First Amendment and the Colorado Constitution.

## FIRST CLAIM FOR RELIEF

**Unlawful Search and Seizure in Violation of First and Fourth Amendments to U.S. Constitution; 42 U.S.C. § 1983**

**(Armendariz against Defendant Summey, Defendant Ditzler, City of Colorado Springs)**

148.     The First Amendment prohibits the government from "abridging the freedom of speech" or the "right of the people peaceably to assemble."

149.     The Fourth Amendment to the U.S. Constitution protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." It requires that "no warrant shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

150.     The animating concerns of the First and Fourth Amendments converge where the power of search and seizure is used as an instrument for stifling liberty of expression. As such, where a search and seizure targets expressive material and associative conduct, the protections of the Constitution are amplified: the Fourth Amendment must be applied with scrupulous exactitude, and the First Amendment may require more than ordinary Fourth Amendment compliance.

151.    The search and seizure of Ms. Armendariz's devices and digital data was unjustified, retaliatory, and carried out pursuant to dragnet warrants that not only swept up protected expressive and associational materials but failed to comply with basic constitutional requirements.

152.    Ms. Armendariz's digital devices contain a wealth of private and sensitive First Amended-protected information.

153.    The Armendariz search warrants failed to limit adequately the scope of the privacy intrusion it authorized.

154.    The Armendariz search warrant (a) violated the particularity requirement; (b) exceeded the scope of probable cause established in the affidavit; (c) failed to limit the search to evidence of a specific crime; (d) affirmatively rejected a date-range limitation; and (e) failed to limit the discretion of the officer executing the search.

155.    In addition, the search warrant failed to exhibit the "scrupulous exactitude" required of searches that target views, associations, and activities that the First Amendment protects. The searches for key words "police, officer, cop, pig, and yt" broadly target any and all mentions, views, or discussions that implicate such critical public issues as race and policing. Similarly, the search for any file with the word "protest" includes a wide range of First Amendment views and activity that has no connection to the crime under investigation.

156.    The search and seizure of Ms. Armendariz's digital data was not reasonable under the circumstances.

157.    On information and belief, investigation of the charge of attempted assault furnished no need to search Ms. Armendariz's laptops, cell phones, and external hard drives.

158.    Investigation of the charge of attempted assault could have been achieved through less intrusive means.

159.    In his capacity as a CSPD officer and in furtherance of a CSPD investigation, Defendant Summey drafted and submitted the applications for search warrants that caused and resulted in the unconstitutional search and seizure of Ms. Armendariz's devices and digital data.

160.    In his capacity as a CSPD officer and in furtherance of a CSPD investigation, Detective Ditzler reviewed and approved the applications for search warrants that caused and resulted in the unconstitutional search and seizure of Ms. Armendariz's devices and digital data.

161.    The deficiencies of the affidavit and applications for search warrants would have been apparent to any reasonably well-trained officer applying clearly established law.

162.    In the manner described above, Defendants Summey and Ditzler were personally involved in or personally directed, controlled, or authorized the actions that violated Ms. Armendariz's constitutional rights. Defendants' actions set in motion a series of events they knew or reasonably should have known would cause others to deprive Ms. Armendariz of her constitutional rights.

163.    Defendant Ditzler knew of and acquiesced to the constitutional violations committed by his subordinate. In doing so, Ditzler disregarded known or obvious consequences of his actions, exhibiting deliberate indifference to Ms. Armendariz's rights.

164.    As a direct and proximate cause of Defendants' actions, Ms. Armendariz's constitutional rights were violated, entitling her to relief.  Additionally, as a direct and proximate cause of Defendants' actions, Ms. Armendariz suffered injuries, including mental and emotional distress.

165.    The unconstitutional search warrants targeting Ms. Armendariz's digital devices were obtained as part of a custom, policy, and practice of CSPD and the City of Colorado Springs.

166.    Ms. Armendariz is entitled to an award of damages from each of the Defendants responsible for the violation of her rights, including Defendants Summey, Ditzler, and Colorado Springs; an award of reasonable attorney's fees and costs; and such additional relief as the Court deems just.

167.    In addition, Defendant City of Colorado Springs retains copies of the illegally seized materials and confidential information.

168.    The City of Colorado Springs has no legitimate interest in retaining copies of Armendariz's digital devices, which were seized in purported connection with a now-ceased criminal prosecution.

169.    Armendariz is entitled to an equitable award of injunctive relief ordering the City of Colorado Springs to return or destroy all copies of Armendariz's digital devices and all files of information extracted from those devices in its possession and/or control.

## SECOND CLAIM FOR RELIEF

**Unlawful Search and Seizure in Violation of First and Fourth Amendments to U.S. Constitution; 42 U.S.C. § 1983**

**(Chinook Center against Detective Steckler, Detective Otero, City of Colorado Springs)**

170.    The allegations of the foregoing paragraphs are incorporated by reference as though fully set forth herein.

171.     The Chinook Facebook warrant authorized the search and seizure of private messages of the Chinook Center, its members, and associates, all of whom had a reasonable expectation of their privacy.

172.     The private messages contained First Amendment-protected information about the social and political views and activities of the Chinook Center, its members, and its associates.

173.     The search and seizure of the Chinook Center's private Facebook messages was unjustified, retaliatory, and carried out pursuant to a warrant that not only swept up protected expressive and associational materials but failed to comply with basic constitutional requirements.

174.     The affidavit in support of the warrant was wholly lacking in probable cause.

175.     The warrant also failed to comply with the Fourth Amendment because:

   a)  The warrant violated the particularity requirement;

   b)  The warrant failed to limit sufficiently the scope of the search; and

   c)  The warrant failed to limit the search to evidence of a specific crime.

176.      In his capacity as a CSPD officer and in furtherance of a CSPD investigation, Detective Steckler drafted and submitted the application for search warrant that resulted in the unconstitutional search and seizure targeting the Chinook Center.

177.      In his capacity as a CSPD officer and in furtherance of a CSPD investigation, Detective Otero reviewed and approved the application for search warrant that resulted in the unconstitutional search and seizure targeting the Chinook Center.

178.     In the manner described above, Defendant Steckler and Detective Otero were personally involved in or personally directed, controlled, or authorized the actions which violated the Chinook Center's constitutional rights. Defendants' actions caused and set in motion a series of events they knew or reasonably should have known would cause others to intrude upon the Chinook Center and its members' constitutional rights.

179.     The deficiencies of the affidavit and application for search warrant would have been apparent to any reasonably well-trained officer applying clearly established law.

180.     Defendants disregarded known or obvious consequences of their actions, exhibiting deliberate indifference to the Chinook Center's rights.

181.     As a direct and proximate cause of Defendants' actions, the Chinook Center's constitutional rights were violated, entitling it to relief.

182.     The unconstitutional search warrant targeting Chinook Center was obtained by CSPD as part of a custom, policy, and practice of CSPD and the City of Colorado Springs.  That custom and policy was a cause of the violation of Chinook Center's rights.

183.     The Chinook Center is entitled to an award of nominal damages from each of the Defendants responsible for the violation of its rights, including Defendants Steckler, Otero, and Colorado Springs; an award of reasonable attorney's fees and costs; and such additional relief as the Court deems just.

## THIRD CLAIM FOR RELIEF

**Unlawful Search in Violation of Stored Communications Act,**
**18 U.S.C. 2707, for violations of 18 U.S.C. 2703(a), (b), and (d)**
**(Chinook Center against Detective Steckler, Detective Otero, City of Colorado Springs)**

184.     The allegations of the foregoing paragraphs are incorporated by reference as though fully set forth herein.

185.     A search warrant or court order requiring the disclosure of a wire or electronic communication by a third-party provider of electronic communications services or remote computing services such as Facebook must comply with the Stored Communications Act.

186.     Facebook is an electronic communication service and a provider of remote computing services which provides users with the ability to send or receive and store wire or electronic communications.

187.     The private Facebook messages of the Chinook Center, its members, and associates were wire and electronic communications stored for less than 180 days through Facebook's system.  The warrant to require disclosure of these private messages failed to comply with the requirements of 18 U.S.C. § 2703(a).  It also failed to comply with the requirements of 18 U.S.C. § 2703(b).

188.     The warrant ordering disclosure of the contents of these private Facebook messages was not supported by an affidavit establishing probable cause.  The affidavit seeking the warrant fails to identify a specific crime for which evidence is sought.  Nor does it show that evidence of crime will be found in the records sought.  Thus, the warrant for these private messages fails to comply with the requirements of either 18 U.S.C. § 2703(a) or 2703(b)(1)(A).

189.     The warrant also fails to comply with the requirements of 18 U.S.C.

2703(b)(1)(B).  To comply with that subsection, the government must provide prior notice to the

subscriber or customer.  Here, the warrant affirmatively forbids such prior notice.  In addition,

the affidavit fails to identify "specific and articulable faces showing that there are reasonable

grounds to believe that the contents of a wire or electronic communication, or the records or

other information sought, are relevant and material to an ongoing criminal investigation," as

required by 18 U.S.C. § 2703(d).   Thus, the warrant fails to comply with the requirements of 18

U.S.C. § 2703(b)(1)(B)(ii), which references and incorporates the standard of § 2703(d).

190.     The deficiencies of the affidavit and application for search warrant, and the

warrant that issued, would have been apparent to any reasonably well-trained officer applying

clearly established law.

191.     Chinook Center did not receive prior notice of the warrant seeking disclosure of

its Facebook account information, including the contents of its and its members' wire or

electronic communications.  Pursuant to the warrant, Facebook provided the defendants with

Chinook Center's records, information, and electronic files, including private confidential

communications.

192.     Chinook Center did not consent to such disclosure of the records of its

Facebook account or the contents of its or its members' wire or electronic communications.

193.     The agents of the City of Colorado Springs who sought and approved and

served the warrant for Chinook Center's Facebook records acted with a knowing and intentional

state of mind.   Pursuant to 18 U.S.C. § 2702, Chinook Center is a person aggrieved by the

violations of the Stored Communications detained in this Complaint.

194.     Chinook Center suffered actual damages, for which it seeks nominal compensation as well as punitive damages.

**FOURTH CLAIM FOR RELIEF**

**Deprivation of Rights in Violation of Colo. Const. art. II §§ 7, 10, 24;
C.R.S. § 13-21-131**

**(Armendariz against Defendant Summey, Defendant Ditzler)**

195.     The allegations of the foregoing paragraphs are incorporated by reference as though fully set forth herein.

196.     Article II, section 7 of the Colorado Constitution forbids unreasonable searches and seizures and protects the privacy of Ms. Armendariz's files. Articles II, section 10 of the Colorado Constitution protects the freedom of speech. Article II, section 24 of the Colorado Constitution protects the right to assemble for the common good, and to apply to those invested with the powers of government for redress of grievances by petition or remonstrance. Article II sections 7, 10, and 24 of the Colorado Constitution create binding obligations on Defendant Summey and Ditzler and the City of Colorado Springs.

197.     The Colorado Constitution places heightened limitations on searches and seizures that target protected expression and associations.

198.     The search and seizure of Ms. Armendariz's devices and digital data violated article II sections 7, 10, and 24 of the Colorado Constitution.

199.     Defendant Summey drafted and submitted the applications for search warrants that subjected Ms. Armendariz, or caused Ms. Armendariz to be subjected to, a search and seizure of her devices and digital data that deprived her of individual rights secured by article II sections 7, 10, and 24 of the Colorado Constitution.

47

200.     Detective Ditzler reviewed and approved the applications for search warrants that subjected Ms. Armendariz, or caused Ms. Armendariz to be subjected to, a search and seizure of her devices and digital data that deprived her of individual rights secured by article II sections 7, 10, and 24 of the Colorado Constitution.

201.     Defendants Summey and Ditzler failed to intervene to prevent the deprivation of Ms. Armendariz's individual rights secured by article II sections 7, 10, and 24 of the Colorado Constitution.

202.     Ms. Armendariz is entitled to an award of damages against Defendants Summey and Ditzler for the deprivation of her individual rights secured by article II, sections 7, 10, and 24 of the Colorado Constitution.

203.     The City of Colorado Springs retains copies of Ms. Armendariz's digital devices that were the fruits of its agents' unlawful search and seizure.

204.     The City of Colorado Springs has no legitimate interest in retaining copies of Ms. Armendariz's digital devices, which were seized in purported connection with a now-ceased criminal prosecution.

205.     Ms. Armendariz is entitled to an equitable award of injunctive relief ordering the City of Colorado Springs to return or destroy all copies of Ms. Armendariz's digital devices in its possession and/or control.

**FIFTH CLAIM FOR RELIEF**

**Deprivation of Rights in Violation of Colo. Const. art. II §§ 7, 10 & 24;
C.R.S. § 13-21-131
(Chinook Center against Detective Steckler, Detective Otero)**

206.     The allegations of the foregoing paragraphs are incorporated by reference as though fully set forth herein.

207.     Article II, section 7 of the Colorado Constitution forbids unreasonable searches and seizures and protects the privacy of Chinook Center's and its members' electronic communications on its private Facebook page. Articles II, section 10 of the Colorado Constitution protects the freedom of speech. Article II, section 24 of the Colorado Constitution protects the right to assemble for the common good, and to apply to those invested with the powers of government for redress of grievances by petition or remonstrance. Article II sections 7, 10, and 24 of the Colorado Constitution create binding obligations on Detectives Steckler and Otero.

208.     The Colorado Constitution places heightened limitations on searches and seizures that target protected expression and associations.

209.     The search and seizure of Chinook Center's Facebook messages violated article II sections 7, 10, and 24 of the Colorado Constitution.

210.     Detective Steckler drafted and submitted the application for search warrant that subjected the Chinook Center, or caused the Chinook Center to be subjected to, a search and seizure of its and private messages that deprived it and its members of rights secured by article II sections 7, 10, and 24 of the Colorado Constitution.

211.     Detective Otero reviewed and approved the application for search warrant that subjected the Chinook Center, or caused the Chinook Center to be subjected to, a search and seizure of its and private messages that deprived it and its members of rights secured by article II sections 7, 10, and 24 of the Colorado Constitution.

212.     Detectives Steckler and Otero failed to intervene to prevent the deprivation of the Chinook Center and its members' rights secured by article II sections 7, 10, and 24 of the Colorado Constitution.

213.     The Chinook Center is entitled to an award of nominal damages against Detectives Steckler and Otero for the deprivation of its rights and the rights of its members secured by article II, sections 7, 10, and 24 of the Colorado Constitution.

## SIXTH CLAIM FOR RELIEF

### Injunctive Relief under U.S. Const. Amends. I & IV; 5 U.S.C. § 702

### (Armendariz against Federal Bureau of Investigation)

214.     The allegations of the foregoing paragraphs are incorporated by reference as though fully set forth herein.

215.     On information and belief, Defendant Federal Bureau of Investigation retains copies of electronic files obtained from Ms. Armendariz's digital devices.  The Federal Bureau of Investigation's failure to return or destroy the materials constitutes a continuing and ongoing seizure that violates the Fourth Amendment.

216.     Ms. Armendariz is entitled to an award of injunctive relief under the Constitution of the United States and 5 U.S.C. § 702 ordering the return or destruction of Ms. Armendariz's digital data.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Armendariz respectfully requests the following relief:

        a.      An award of damages pursuant to 42 U.S.C. § 1983 and C.R.S. § 13-21-131 against Defendants Summey, Ditzler, and the City of Colorado Springs;

        b.      An award of punitive damages against Defendants Summey and Ditzler;

        c.      An injunction ordering the City of Colorado Springs and Federal Bureau of Investigation to return or delete the electronic copies of Ms. Armendariz's digital devices and the files extracted from them;

        d.      An award of costs and attorney's fees pursuant to 42 U.S.C. § 1988 and C.R.S. § 13-21-131(3); and

        e.      Such additional relief as the Court deems just.

WHEREFORE, the Chinook Center respectfully requests the following relief:

        a.      An award of nominal damages against Defendants Steckler, Otero, and the City of Colorado Springs pursuant to 42 U.S.C. § 1983 and C.R.S. § 13-21-131;

        b.      An award of actual damages in a nominal amount and punitive damages against Detective Steckler, Detective Otero, and the City of Colorado Springs pursuant to 18 U.S.C. § 2707(c);

        c.      An award of costs and attorney's fees pursuant to 42 U.S.C. § 1988 and C.R.S. § 13-21-131(3); and

        d.      Such additional relief as the Court deems just.

The Chinook Center and Ms. Armendariz hereby demand a trial by jury.

Dated: August 1, 2023

        Respectfully submitted,

        *s/ Theresa Wardon Benz*

        Theresa Wardon Benz
        Jacqueline V. Roeder
        Elise Reecer
        Davis Graham & Stubbs LLP

1550 17th Street, Suite 500
Denver, CO 80202
303-892-9400
jackie.roeder@dgslaw.com
theresa.benz@dgslaw.com
elise.reecer@dgslaw.com

*In cooperation with the ACLU Foundation of Colorado*

Timothy R. Macdonald
Sara R. Neel
Annie I. Kurtz
Mark Silverstein
American Civil Liberties Union Foundation of Colorado
303 E. 17th Ave., Suite 350, Denver, CO 80203
720-402-3151
tmacdonald@aclu-co.org
sneel@aclu-co.org
akurtz@aclu-co.org
msilverstein@aclu-co.org

*Attorneys For Plaintiffs*